1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

PROMEDEV, LLC dba RELIEF FACTOR

Plaintiff,

v.

ROBY WILSON (individual) and
MAXXIMEDIA ADVERTISING CO; and
IMAGIPIX CORPORATION.

Defendants.

Case No.

**PROMEDEV, LLC'S COMPLAINT FOR:**
1) **BREACH OF CONTRACT;**
2) **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
3) **BREACH OF FIDUCIARY DUTIES;**
4) **CIVIL COERCION, EXTORTION, AND BLACKMAIL**
5) **DECLARATORY JUDGMENT**

**DEMAND FOR JURY TRIAL**

Plaintiff Promedev, LLC d/b/a "Relief Factor" ("Plaintiff" or "Promedev") brings this action against Defendants Roby Wilson ("Wilson"), an individual, MaXXiMedia Advertising Company ("MaXXiMedia") (collectively, "MaXXiMedia Defendants") and Imagipix Corporation ("Imagipix,").

## I.     PARTIES

1.      Plaintiff Promedev is a limited liability company incorporated under the laws of the State of Washington, with its principal place of business in Kirkland, Washington.

2.      On information and belief, defendant, Roby Wilson, is a citizen of the State of Texas and, on information and belief, is the owner and Chief Executive Officer of MaXXiMedia and owner of Imagipix.

3.      On information and belief, defendant MaXXiMedia is a corporation incorporated under the laws of the State of Texas, with its principal place of business in Spring, Texas.

4.      On information and belief, defendant Imagipix is a corporation incorporated under the laws of the State of Texas, with its principal place of business in Spring, Texas.

## II.     JURISDICITON / VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy easily exceeds the sum of $75,000, exclusive of costs and interest.

6.      The Court has personal jurisdiction over Roby Wilson, MaXXiMedia and Imagipix because they have conducted business in the state of Washington and within this District. Specifically, Roby Wilson, in his personal capacity and acting on behalf of MaXXiMedia and Imagipix, traveled to Washington on numerous occasions to meet with Plaintiff and perform obligations under the Agreement and has been engaged to provide services for Promedev.

7.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in King County in Washington State.

COMPLAINT - 2
CASE NO.

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029 | Tel: 206.839.4800

### III.   FACTS

8.     MaXXiMedia is a media buyer and advertising agency owned by Defendant Roby Wilson. MaXXiMedia promotes itself as an advertising agency that manages the purchase and placement of all media for its clients. MaXXiMedia claims to have long-standing relationships with television networks, and in particular Fox News Channel ("FNC"), that allows it to deliver lower rates and additional value to its clients. MaXXiMedia advises its clients to authorize it to be the primary contact with the networks and, to that end, controls the communications and transmission of the clients' payments to the networks, even though the clients sign agreements with the networks, negotiated by MaXXiMedia, which obligate the clients to pay the networks' invoices.

9.     On information and belief, Roby Wilson is the owner and Chief Executive Officer of MaXXiMedia. Wilson holds himself out as a "media/advertising expert" and agent to all his clients. Wilson equates himself and MaXXiMedia to a "talent agent" in the entertainment industry, acting as a fiduciary for MaXXiMedia's clients.

10.    On information and belief, Imagipix is a company that is owned and/or affiliated with MaXXiMedia and Wilson and provides the post-production services of Bill Newton ("Newton"). Counsel for the MaXXiMedia Defendants has stated that Imagipix is Wilson's production company. As explained in more detail below, Wilson has improperly asserted that Imagipix has rightfully filed copyright registrations relating to Promedev's commercials despite the fact that Wilson and Newton were engaged on a work-for-hire basis.

11.    Promedev, LLC d/b/a "Relief Factor" is a nutrition supplement company specializing in the sale of Relief Factor, a powerful 100% drug-free botanical and fish oil research-based formula that was created to help support the body's inflammatory response. Promedev researched and developed Relief Factor with the help of leading medical doctors, naturopathic physicians, and chiropractors. Relief Factor is the end-result of over 15 years of

clinical practice and research by physicians who were determined to find a better solution to help patients with pain associated with aging, exercise, and everyday living.

      **A.**    **Promedev Hired Roby Wilson and MaXXiMedia as Its Agents**

12.    In or around 2018, Wilson traveled to Washington to meet with Promedev. Wilson pitched MaXXiMedia's services to Promedev as a media buying agency with exclusive rates and access to national television networks and a one-stop-shop for all Promedev's marketing and advertising needs. Wilson promised that he could get Relief Factor advertising onto national network television spots for a fraction of the price that other advertising agencies could.

13.    At the same time, Wilson also pitched his services as a director and his ability to supervise post-production work to be performed by Newton. These services were to be provided as works-for-hire and Wilson never suggested otherwise or claimed any ownership interest would result of the provision of these services.

14.    At the time, Promedev was just beginning to advertise Relief Factor on a national scale and sought advice regarding national media buying and placement. Though Promedev wanted to retain all control of the creative aspects of it marketing and advertising efforts – including scripting, creative vision, casting talent, and the like – Promedev was interested in the directing and post-production services offered by Wilson. Wilson represented that the full-service package offered by MaXXiMedia namely, negotiating media rates, buying and placing media, servicing existing contracts for the term of the contract, communicating with networks on Promedev's behalf, and facilitated securing vendor services to be paid by Promedev, directing and post-production services such as editing, publishing, and distributing advertising content at Promedev's direction and control – was the most cost-effective and efficient way to market itself on a large scale.

15.    In or around 2018, Promedev entered into a hand-shake agreement and agency relationship with Wilson and MaXXiMedia whereby Promedev was the principal/client, and the MaXXiMedia Defendants were the agents.

16.     Promedev and Roby Wilson had a mutual understanding that MaXXiMedia Defendants would act as Promedev's agent in order to communicate and negotiate with networks. Specifically, in exchange for a fifteen percent (15%) agency fee, MaXXiMedia would communicate directly with television networks, negotiate media deals, service Promedev's network agreements, facilitate payment on network accounts, and represent Promedev in any other capacity necessary to purchase and place all television media for Promedev. Wilson represented that the agency fee would also cover any compensation for services provided by Wilson and Newton under Wilson's supervision such as: facilitating securing vendor services to be paid by Promedev, and directing and post-production services such as editing, publishing, and distributing advertising content at Promedev's direction and control. Promedev placed its trust in Wilson and MaXXiMedia to carry out these responsibilities with Promedev's best interest in mind. The parties operated under this hand-shake arrangement until July 2020.

17.     In or around 2018, Promedev began working with the MaXXiMedia Defendants on the production of commercials for Relief Factor. Promedev remained responsible for all three phases of the commercial production – pre-production, production, and post-production. In addition to being financially responsible for the commercial production, Promedev remained responsible for creative aspects including budgets, scripts, hiring talent, and selecting and/or approving venues. As agreed upon between the parties, Promedev hired MaXXiMedia to provide the services of Wilson as a director and Newton on post-production under Wilson's supervision. As obligated under the agreement, MaXXiMedia then placed the advertising with Fox News Channel ("FNC") and later Newsmax.

18.     Promedev relied upon the MaXXiMedia Defendants' representations about its advantageous relationships with networks – specifically, FNC and Newsmax. Wilson represented to Promedev that MaXXiMedia was able to get rates from these networks that were otherwise unavailable to Promedev. Based on Wilson's representations, Promedev agreed to allow the MaXXiMedia Defendants to serve as its agent with respect to those media buys. As a result,

Promedev did not have direct contact with the networks.  Instead, Promedev was required to enter into separate year-long media purchase agreements which were negotiated and then presented by the MaXXiMedia Defendants, under which Promedev became responsible to the networks for payment. At or around the end of each month, the networks provided invoices for Promedev's monthly media buy. MaXXiMedia then issued its own invoice to Promedev for the amounts owed to the networks and its monthly commission. After Promedev paid MaXXiMedia's invoice, MaXXiMedia represented that it would pay the networks invoices in full on Promedev's behalf.

**B.**   **Promedev and MaXXiMedia Negotiated the Terms of the MaXXiMedia Advertising Co. Agreement**

19.   As Promedev's business grew, so do its spending on advertising. MaXXiMedia's fifteen percent (15%) agency fee grew to about $120,000 per month. As a result, in or around the first half of 2020, Promedev began reconsidering its relationship with MaXXiMedia based on the belief that it could obtain a more favorable financial arrangement elsewhere.

20.   On July 28, 2020, Pete Talbott ("Talbott"), on behalf of Promedev, had a telephone conversation with Wilson and MaXXiMedia to discuss the relationship and the possible termination of it. Also on July 28, 2020, after the telephone call, Wilson sent an email to Talbott.

21.   In the July 28th email to Talbott, Wilson made several claims for why Promedev should continue working with MaXXiMedia as opposed to other advertising agencies or media buyers:

a.   "[H]ere's how I/MaXXiMedia differ/s mostly from the 'big agencies' service and rate integrity. They may offer a low commission percentage, but I can guarantee you 100% they will make up that 'low' percentage with higher rates."

b.   "Added value…as discussed earlier the productions services we provide could easily be over $100k+ annually if not more. We're at $300.00 a spot,

but frankly since your spending has increased, I haven't charge you anything on production in months and I'd like to keep it that way. I have no doubt a 'big agency' can you provide you w/ production from an independent producer, but it will cost a lot of money $$$, and you will have nowhere near the flexibility or access you have with me."

22.     In the same July 28th email, Wilson made the following offer to Promedev: "At your current spend I propose we dispense w/ the current scale percentage that ends at 8% for $5,000,001.00 and go with a flat 6% for all future billing including JUL billing. […] If you want to discuss a high and low cap, I'm open to that, as well."

23.     Though Promedev was considering moving all agency responsibilities in-house, Promedev was open to negotiating a forward-looking agreement with Wilson for a 6% flat rate. Talbott responded to Wilson's July 28, 2020, email with a counter proposal.

24.     Talbott's July 28, 2020, counter proposal offered the following terms:

a.     A six percent (6%) flat commission rate on Promedev's monthly advertising spend with a $50,000 per month maximum. This netted to $500,000 a year for Wilson for creative product and an additional $100,000 for Wilson's production work.

b.     Promedev would reimburse Wilson's personal travel expenses (air and housing) for all scheduled filming sessions.

c.     If Promedev spent over $3,000,000.00 on television advertising in any given month, Wilson would receive an additional $10,000 for that month in addition to the $50,000 monthly maximum.

d.     If Promedev spent over $5,000,000.00 on television advertising in any given month, Wilson would receive an additional $10,000, totaling $20,000, for that month.

COMPLAINT - 7
CASE NO.

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029 | Tel: 206.839.4800

25.     Under Talbott's counter proposal, Promedev requested and expected to retain control over creative aspects of commercials, arrangements for production, and maintain all editorial control, including: (1) arranging and booking all talent and paying the talent, (2) paying the out-of-pocket expenses for the shoot, and (3) scripting all commercials.

26.     On or around July 29, 2020, Wilson responded to Talbott's July 28th email, thanked Talbott for the "generous" offer, proposed the addition of a "minimum monthly cap of $30k," and suggested adding a mutual termination clause that ran the full term of the agreement.

C.    **The July 31, 2020 MaXXiMedia Advertising Co. Agreement**

27.     On or around July 31, 2020, the parties executed the MaXXiMedia Advertising Co. Agreement (the "Agreement"). The Agreement was meant to memorialize the agreed upon terms in the July 28th and 29th negotiations between the parties. A true and correct copy of the Agreement is attached hereto as Exhibit A and incorporated by reference.

28.     As set forth further at paragraph 29, the Agreement includes various terms setting forth how Wilson would be compensated for his work, that Promedev was responsible for making payments to television networks for purchased media spots, and that Promedev would own all creative work. At Wilson's suggestion, the Agreement also includes a clause allowing either party to terminate the Agreement for convenience at any time after sixty (60) days' notice.

29.     Under the express terms of the Agreement, the parties' respective duties and obligations are as follows:

a.     Section 1 of the Agreement sets forth that MaXXiMedia, referred to throughout the Agreement as "the Agency" was to "provide services necessary to purchase and place all media for [Promedev], specifically television."

b.     Section 4 of the Agreement sets forth the terms under which MaXXiMedia should be compensated: Promedev agreed to pay MaXXiMedia an "Agency commission or fee of 6% of the gross television media spend on

1    a monthly basis" for "all media placement/buy." The parties further

2    agreed to a "hi/lo cap not to exceed $50,000.00 or go below $30,000."

3    Promedev also agreed to pay MaXXiMedia an additional $10,000 in the

4    event Promedev "exceeds $3,000,000 in one month," and an additional

5    $20,000,00 in the event Promedev "exceeds $5,000,000 in one month."

6    MaXXiMedia could charge Promedev for "additional products and/or

7    services as ordered" by Promedev if those additional products or services

8    were not part of the "Services" covered by the Agreement – i.e., non-

9    television services. Finally, Promedev agreed to pay MaXXiMedia for "all

10   reasonable out-of-pocket miscellaneous expenses" and Wilson's travel

11   and lodging when traveling for client creative and production.

12   c.    Section 5 of the Agreement states that Promedev "is responsible for all

13   billing and purchases" that MaXXiMedia makes on Promedev's behalf

14   and that MaXXiMedia "will invoice [Promedev] at the time of the services

15   rendered." Section 5 also provides that "[a]dditional products and services,

16   and allowable expenses may also be invoiced at any time." Section 5

17   provides that "Payments shall be made in a timely fashion."

18   d.    Section 6 of the Agreement provides for timing of Promedev's payments

19   to MaXXiMedia and allows for payment "within thirty days" or on the

20   "due date."

21   e.    Section 8 explicitly provides that upon "payment in full" to MaXXiMedia,

22   Promedev "shall have **_full rights and ownership of any 'creative_**

23   **_product_**.'" Section 8 distinguishes that "work product" – i.e., "[m]edia

24   buying services, work or materials . . . created by [MaXXiMedia] . . .

25   remains the sole property of [MaXXiMedia]."

26

27

28

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029 | Tel: 206.839.4800

f.    Under Section 10 of the Agreement, MaXXiMedia acknowledged and agreed that Promedev's "remedy at law for breach or threatened breach" by MaXXiMedia of Section 8 "would be inadequate" and deems any such breach "as causing irreparable harm" to Promedev. Section 10 provides that, if such a breach occurs – as is the case here –Promedev may seek and obtain injunctive relief, or any other appropriate equitable remedy.

g.    Section 13 of the Agreement provides that it "may be terminated by either party on sixty (60) days written notice to the other party."  Section 13 instructs that Promedev "shall promptly pay all sums owed" to MaXXiMedia "to and including the effective date of termination, including any future non-cancelable commitment after the termination date."

30.    As was the case prior to the Agreement, based on Wilson's representations, Promedev agreed to allow the MaXXiMedia Defendants to serve as its agents with respect to media buys with networks. Promedev did not have direct contact with the networks. Instead, MaXXiMedia negotiated and then presented Promedev with separate year-long media purchase agreements under which Promedev became responsible to the networks for payment. At or around the end of each month, the networks provided invoices for Promedev's monthly media buy. MaXXiMedia then issued its own invoice to Promedev that included the amounts owed to the networks and also MaXXiMedia's monthly commission amount. After Promedev paid MaXXiMedia's invoice, MaXXiMedia represented that it would pay the networks' invoices in full on Promedev's behalf.

31.    With respect to advertising on FNC, based upon the MaXXiMedia Defendants' representations, Promedev entrusted the MaXXiMedia Defendants to control all communications and negotiate rates. FNC sought a year-long commitment from Promedev and, to that end, MaXXiMedia would negotiate and place an order for a full calendar year. In connection with

Promedev's 2022 advertising with FNC, FNC sent a letter dated December 17, 2021 and addressed it to Promedev, MaXXiMedia and Wilson ("FNC Agreement").  The December 17, 2021 letter confirmed the media order placed by MaXXiMedia on behalf of Promedev for all advertising for the 2022 calendar year.

32.     As of the filing of this Complaint, Promedev was and is in full compliance with the express terms of the Agreement.

**D.      Promedev Elects to Terminate the Agreement Pursuant to Section 13 of the Agreement**

33.     In 2022, Promedev began the process of rebuilding its marketing team to address its media management, media planning, advertising technology and attribution measurement, and production and creative needs. As part of that process, Promedev decided to end its relationship with MaXXiMedia.

34.     On July 1, 2022, pursuant to the express terms of Section 13 of the Agreement, Promedev notified the MaXXiMedia Defendants via telephone and in writing that it was exercising its right to terminate the Agreement for convenience at the end of a sixty-day notice period ending on August 31, 2022. A true and correct copy of the July 1, 2022, formal Notice of Termination of MaXXiMedia Advertising Co. Agreement is attached hereto as Exhibit B.

35.     Also on July 1, 2022, Promedev advised MaXXiMedia that it would continue to pay MaXXiMedia under the terms of the Agreement, but that it would pay the networks' monthly invoices directly instead of paying through MaXXiMedia.

**E.      The MaXXiMedia Defendants Respond to Promedev's Termination Election By Seeking to Retaliate**

36.     Since receiving notice from Promedev of their desire to terminate the Agreement pursuant to Section 13, the MaXXiMedia Defendants have refused to perform in good faith under the Agreement and, in fact, has taken retaliatory actions against Plaintiff.

37.     On July 6, 2022, Tom F. Coleman ("Coleman"), as attorney for the MaXXiMedia Defendants, sent Promedev a letter entitled "Notice of Breach." In the letter, Coleman acknowledged that based on Promedev's notice of termination, the termination was effective on August 31, 2022. However, Coleman stated MaXXiMedia's position that Promedev's stated intent to pay the networks directly going forward "constitutes a breach and anticipatory breach of the Agreement, to the present financial detriment of MaXXiMedia Advertising Co."

38.     On July 8, 2022, Coleman sent a letter – which was approved and signed by Wilson on behalf of MaXXiMedia – to Michael Garfinkel of DLA Piper, LLP ("Garfinkel"), Promedev's counsel, again asserting that Promedev had breached the Agreement, threatening litigation and an attorneys' fees award, and making monetary demands as follows:

a.     Commissions: Although Coleman previously acknowledged that Promedev's termination of the Agreement is effective as of August 31, 2022, MaXXiMedia demanded that Promedev immediately pay in full commissions that it contends would be owed through December 31, 2022.

b.     Expenses: MaXXiMedia demanded the immediate payment of expenses dating back to 2018 in the amount of $162,970.36 without providing sufficient explanation or support for these expenses.  This was the first time during the parties' relationship that MaXXiMedia ever submitted expenses to Promedev.

c.     "Creative Product": MaXXiMedia demanded the immediate payment of $1,380,000 for any "Creative Product" which MaXXiMedia asserted included all of Promedev's commercials dating back to the inception of the relationship in 2018.

d.     "Work Product": MaXXiMedia demanded the immediate payment of $2,000,000 for Promedev to continue to receive the rates provided for in the 2022 FNC and Newsmax Agreements. Even though Promedev agreed

to a year-long media buy with FNC, MaXXiMedia took the position that the rates were proprietary and Promedev would have to pay an additional $2,000,000 to continue with the rates set forth in the agreements.

e. Lifetime Non-Compete and Non-Disparagement: MaXXiMedia demanded the immediate payment of $5,000,000 for an agreement not to compete with Promedev and a mutual non-disparagement provision. As set forth further below, such a demand is not provided for under the Agreement and directly relates to MaXXiMedia's threats to harm Promedev's business and reputation.

39.    On July 10, 2022, Coleman sent an email making additional demands. Coleman's email states: "In addition to the below matters, it has come to our attention that creative product owned by Maxximedia has been used without permission by Relief Factor in digital advertising. We demand an immediate accounting for the total impressions of Maxximedia's Relief Factor creative product on all digital in the universe whether executed by Relief Factor or not and demand an immediate payment of $1 per impression."  Coleman's email demanded immediate payment from Promedev to MaXXiMedia of $12,118,997.40 and threatened that if its demands were not met MaXXiMedia would cause all of Promedev's commercials to be pulled.

40.    On July 11, 2022, Coleman and Garfinkel participated in a telephone conversation regarding MaXXiMedia's claims and demands. During the call, Coleman stated that unless Promedev ceded to MaXXiMedia's demand for the immediate payment of $5,000,000 for Lifetime Non-Compete and Non-Disparagement, MaXXiMedia would disclose defamatory facts about Promedev, its ownership and executives, and the talent hired by Promedev for its commercials. Coleman stated that during the commercial shoots, the microphones picked up so-called "hot mic" recordings – conversations taped without the knowledge or consent of the speakers which allegedly included "racist and misogynist" statements. Coleman further stated

that Promedev should immediately pay all of MaXXiMedia's demands because Promedev is "making money hand over fist."

41.    During the call with Coleman on July 11, 2022, Garfinkel requested backup for the expenses demanded by MaXXiMedia. Later that day, Coleman emailed a copy of a spreadsheet for the expenses sought ("Expense Spreadsheet"). The Expense Spreadsheet contained purported Travel Expenses and Production Expenses dating back to the inception of the relationship in May 2018. Coleman did not provide any backup support for any of the line items.

42.    Also on July 11, 2022, Garfinkel sent an email to Coleman seeking additional information including: (a) a copy of any agreements between MaXXiMedia and FNC or Newsmax, (b) an explanation of why MaXXiMedia demanded commissions beyond the effective termination date, (c) backup for the Expense Spreadsheet, and (d) an explanation of the calculation of the $1,380,000 demanded for Creative Product. In response, MaXXiMedia: (a) refused to provide any agreements between it and FNC or Newsmax on the grounds that they are proprietary, (b) contended that Promedev's commission obligation is coterminous with the FNC Agreement despite acknowledging the effective termination date of August 31, 2022, (c) refused to provide backup for the Expense Spreadsheet, and (d) refused to explain the calculation of the $1,380,000 demanded for Creative Product.

43.    On July 12, 2022, at MaXXiMedia's suggestion, Garfinkel participated in a Zoom meeting with Coleman and Wilson. Wilson recorded the meeting, and Garfinkel agreed to be recorded based on Wilson's agreement to provide a copy, which he did. During the call, Wilson: (a) stated that he and MaXXiMedia are akin to talent agents and Promedev is akin to an actor being represented by a talent agent; (b) asserted that Promedev is in breach of the Agreement unless it paid all sums demanded immediately, despite the effective termination date of August 31, 2022; (c) asserted that Promedev was obligated to pay commissions through December 31, 2022, despite the effective termination date of August 31, 2022; (d) refused to provide backup

for the Expense Spreadsheet; (e) refused to substantiate the demand of $1,380,000 for Creative Product and stated that it was an approximation of his work since 2018; and (f) restated demands for $2,000,000 for Work Product and $5,000,000 for Non-Compete and Non-Disparagement as described above.

44.     When asked about the alleged "hot mic" recordings, Wilson deferred to Coleman. Coleman repeated his prior statements that Wilson had "hot mic" recordings that if released would harm Promedev's reputation and stated that, unless Promedev agreed to pay the $1,380,000 for the Creative Work, Wilson would keep the recordings. Coleman then threatened the release of the alleged "hot mic" recordings by stating that if Wilson had a heart attack and died these recordings could "float out" in the world and harm Promedev's business and reputation. During the call, Wilson referenced his agreement with FNC, which gave him favorable rates. Garfinkel asked for a copy of MaXXiMedia's agreement with FNC, but Wilson refused to agree to provide it claiming it was proprietary. Garfinkel asked whether MaXXiMedia received payments from FNC under its FNC agreement, and Wilson refused to answer.

45.     On July 12, 2022, Promedev communicated to MaXXiMedia Defendants that it would overnight FedEx payment to MaXXiMedia in the amount of $3,151,969.60 if Wilson would provide confirmation that: (i) MaXXiMedia had properly paid all invoices to FNC and Newsmax for Promedev advertising charges, for all broadcast months April 2022 and earlier, as applicable; (ii) MaXXiMedia would promptly pay the May 2022 broadcast month invoices rendered by FNC and Newsmax upon receipt of the payment for $3,151,969.60; and (iii) MaXXiMedia would provide Promedev documentation showing that the FNC and Newsmax May 2022 broadcast month invoices had been paid. Promedev further requested that Wilson provide both the FNC and Newsmax receipts reflecting the payments described. Wilson refused this request by not providing any response.

46.     On July 14, 2022, Wilson sent correspondence to Promedev and Garfinkel restating his demands and making further inflammatory accusations, including:

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029 | Tel: 206.839.4800

a.   "My final question to you is this… how do you think a Texas Jury will interpret this? Do you actually believe you have any chance at all beating this? I don't."

b.   "In order to prevent Fox and Newsmax having no creative to air, wire your agreed upon obligation of $587,027.78 today."

c.   "When and if the account is transferred to Promedev, Promedev will be asked to complete a credit application. Promedev's primary "media credit" reference is MaXXiMedia. MaXXiMedia will have no choice at this point to give a negative credit reference for nonpayment which will result in Promedev being CIA cash in advance with Fox. Promedev does not have the spending amount with other media to satisfy Fox's minimum. MaXXiMedia's will give its approval when the non-disparagement noncompete compete agreement is paid for."

d.   "MaXXiMedia will soon inform Promedev they are no longer permitted to use MaXXiMedia's creative product; at that point Promedev is breach for any future airings and for failure to pay pursuant to Paragraph 6, 8 & 13. MaXXiMedia will then pull all MaXXiMedia creative from the networks pursuant to paragraph 6. Payment for lifetime buyout of Creative Product is $1,380,000.00."

e.   "Promedev's choices are to continue to air w/ MaXXiMedia's work product which will constitute further breach and higher damages sought or renegotiate with Fox for their own rates which are currently 50-100% higher than MaXXiMedia's current rates…regardless of the choice Promedev will still be in breach for unauthorized use of the work product. […] Payment for continued use of work product solely for the duration of the term is $2,000,000.00."

f. "Promedev's future relationships depend greatly on MaXXiMedia's endorsement. […] Payment for [a non-compete/non-disparagement] is $5,000,000.00."

47. Also on July 14, 2022, Promedev sent an email to Wilson advising that Promedev wired the funds to Newsmax and FNC and referenced the invoice numbers. That same day, Promedev paid the $50,000 of commission to MaXXiMedia as invoiced and an additional $10,000 not included on MaXXiMedia's invoice that Promedev believed was owed under the Agreement. This amount was paid to MaXXiMedia Defendants by FedEx because Wilson refused to provide MaXXiMedia's wire information.

48. On July 15, 2022, the MaXXiMedia Defendants sent three invoices to Promedev, true and correct copies of which are attached hereto as Exhibit C, demanding next-business-day payment for the following:

a. $1,380,000.00 for "Payment for copyrighted "Creative Product" pursuant to Paragraph 8 of Agreement 178 spots plus all creative projects and content"

b. $400,000 for "Sums (commissions) owed to the Agency to and including the effective date of termination, including any future non-cancelable commitments after the termination date MAY 22 - DEC 22 8 months @ $50,000.00 per month"

c. $60,000 for "Client exceeds $3,000,000.00 in one month the Agency receives an additional $10,000.00 for that month. 10/21,5/21,1/22,5/22,6/22 and 10/22 6 months @ $10,000.00."

d. $127,087.78 for "Miscellaneous, spot distribution, delivery charges, loading- and travel for production that may be invoiced at any time. see details attached" (Note that no details were attached.)

e.   $2,000,000 for "'Work Product' pursuant to paragraph 8 of agreement includes use of Maxximedia's rates for the duration of the 2022 agreement term. Cannot be referred to beyond use of the term...solely for 2022."

The July 15, 2022, invoices are not itemized, provide no supporting documentation, and with the exception of expenses relating to travel are not provided for under the Agreement.

49.   On July 15, 2022, Garfinkel responded to Wilson's prior email setting forth Promedev's position on some of the issues raised by his email. Later that day, Wilson responded to the email by repeatedly asserting that Promedev breached the Agreement in several respects and continuing to demand the immediate payment of the amounts demanded.

50.   On July 16, 2022, Coleman sent an email to Garfinkel and Promedev, with a copy to Wilson, stating that unless Promedev immediately paid the amounts demanded, MaXXiMedia will file a lawsuit and, to that end, provided a list of individuals that MaXXiMedia intends to depose, including the talent hired by Promedev for its commercials.

51.   On July 18, 2022, Coleman sent another email to Garfinkel and Promedev, with a copy to Wilson. Among other things, Coleman states that MaXXiMedia owns all of the Creative Product, including all of Promedev's commercials. Coleman further states that MaXXiMedia, through Wilson's production company Imagipix, registered copyrights for all of Promedev's commercials with the U.S. Copyright Office and threatened to bring a copyright infringement action against Promedev seeking civil and criminal penalties, statutory damages, cost and fees. Coleman further threatened Promedev with criminal penalties, including imprisonment of up to five year and fines of $250,000 per offense.

52.   On July 19, 2022, Garfinkel and Coleman participated in a telephone call. With regard to the claimed expenses on the Expense Spreadsheet, Garfinkel advised that Promedev would pay all of the Travel Expenses except for one flight to Seattle that was not authorized. With regard to the Production Expenses, Garfinkel asked for backup documentation for Promedev to consider. During the call, Coleman repeated the threats regarding the alleged "hot

1    mic" recordings and stated that if Promedev paid $1,380,000 for the Creative Product, the

2    MaXXiMedia Defendants would destroy the recordings and not divulge the content.

3         53.    On July 21, 2022, Coleman sent another email to Garfinkel, copying Wilson and

4    adding another attorney, Hank Fastoff. The email purports to relay the statements and demands

5    of Wilson on behalf of himself, MaXXiMedia and Imagipix and purports to include Coleman

6    and Fastoff in an effort to "stack the team" for litigation.  Wilson restated his financial demands

7    including  $1,380,000 for Creative Work, $2,000,000 for the alleged Work Product and

8    $5,000,000 for Non-Competition and Non-Disparagement. Wilson again threatened that unless

9    Promedev cedes to his demands by immediately paying all of these claimed amounts, the

10   MaXXiMedia Defendants would sue Promedev for breach of contract, copyright infringement

11   based on Promedev's use of its commercials on digital and streaming as well as potential future

12   uses by Promedev on television, and unauthorized use of his claimed Work Product. In addition

13   to many exaggerated and false claims, Wilson falsely claimed that he was the creator and

14   originated of all of Promedev's commercials. Wilson also again threatened to tarnish Promedev's

15   reputation and harm its business by, among other things, causing the removal of Promedev's

16   commercials from networks and bringing Promedev's direct competitors to FNC and Newsmax

17   and other medium with the goal to "replace and compete with Promedev."

18        54.    Further, on July 25, 2022, Coleman sent yet another email to Garfinkel containing

19   a message prepared by Wilson setting forth further explicit threats and coercive demands for

20   payment, including:

> Relief Factor refuses to pay immediately the $527,027.78 owed for
> commission and $1,380,000.00 for creative product. **We file suit
> and remove all commercials:** Immediate impact Relief Factor
> instantly loses 70% of their daily revenue and negatively impacts
> cash flow. Maxximedia will have itself removed from credit
> liability and Relief Factor goes Cash in Advance….again another
> massive hit to cash flow. **Relief Factor's creditability and good
> will which are tied to Maxximedia is instantly destroyed and
> will NOT be recoverable. I will assure that.** Six figure or more
> in  attorneys'  fees,  devastating  depositions  and  testimonies,
> discovery...which opens their books and operations and certainly
> draw  scrutiny  and  **unwelcomed  attention  from  various**

**Government agencies…** The Washington State Department of Health, The Washington Medical Commission, FDA, FTC, FCC, IRS, The Washington State AG and other States Attorneys General to name a few. MOST IMPORTANT Maxximedia's disadvantage: Relief Factor's cash flow and revenue takes a massive hit due to the loss of traffic and **Maxximedia introducing superior competitors in the space coupled negative social campaigns targeting Relief Factor**, my analysis predicts their inability to pay when we prevail or worse, they'll file Chapter 7 or 11 in 6-9 months well before we receive a favorable judgement.

[…]

Relief Factor agrees to the **$5,000,000.00** Non Compete/Non Disparagement buy out. Maxximedia has already outlined in detail its plan to bring in superior competitors in to Relief Factor's current non-competitive space. Not only will Relief Factor not have the advantage of Maxximedia's work product, their share, 100% now will be quickly eroded to nothing once **Maxximedia launches a "comparative campaign" with a direct competitor in all media coupled with additional negative social campaign.** Maxximedia has extensive experience in this strategy and a record of success. However, in this scenario Relief Factor's Media for Fox and Newsmax will increase from $37,000,000.00 to at least $74,000,000.00. This all coupled with Maxximedia's reversal of endorsement of Relief Factor.

[Emphasis added.]

55.    In summary, as of the date of this filing, Promedev is in full compliance with its obligations under the Agreement.   In fact, even though the MaXXiMedia Defendants have improperly invoiced for expenses as far back as 2018 and have failed to provide the requested documentation supporting the validity of those expenses, Promedev will pay all of the Travel and Production Expenses listed on the Expense Spreadsheet except for one flight to Seattle that was not authorized.

56.    As such, contrary to the MaXXiMedia Defendants' claims and demands, Promedev owns all of the Creative Product as confirmed by the Agreement, there is not obligation for Promedev to pay for digital/streaming rights to use Promedev's own commercials, and there is no obligation to pay for Work Product or a Non-Competition and Non-Disparagement agreement.

57.     As of the date of this filing, MaXXiMedia Defendants continue to make unfounded monetary demands of Plaintiff that are not provided for under the terms of the Agreements and continue to make disparaging remarks and threats of reputational harm to Promedev.

## CLAIMS FOR RELIEF

### Count One

### *Breach of Contract*

### (Defendants Roby Wilson and MaXXiMedia)

58.     Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of the Complaint as though fully set forth herein.

59.     Plaintiff has performed all terms, conditions and covenants required on its part to be performed in accordance with the Agreement, except those terms, conditions, and covenants, if any, that MaXXiMedia has waived or that Plaintiff is excused or prevented from performing by virtue of MaXXiMedia's material breaches of the Agreement or other acts and omissions.

60.     MaXXiMedia has materially breached the Agreement in several respects stated above, including: (a) asserting ownership and registering copyrights on Promedev's commercials; (b) demanding immediate payment in full of all commissions through December 31, 2022; (c) demanding immediate payment of Travel Expenses and Production Expenses for the period from 2018 to the present, even though there is no contractual obligation regarding the expenses incurred prior to the Agreement and MaXXiMedia failed to properly bill and provide supporting documentation for all expenses; (d) demanding immediate payment of $1,380,000 for Creative Product for the period from 2018 to the present, even though there is no contractual obligation related to Creative Product that pre-dates the Agreement, MaXXiMedia failed to properly bill and provide supporting documentation for the Creative Product it claims to ownership of, and there is no contractual obligation under the Agreement for Promedev to pay for such Creative Product; (e) demanding immediate payment of $2,000,000 for Work Product for the period from

2018 to the present, even though there is no contractual obligation related to such Work Product pre-dating the Agreement, MaXXiMedia failed to properly bill and provide supporting documentation for such Work Product, and there is no contractual obligation under the Agreement for Promedev to pay for such Work Product; and (f) demanding immediate payment of $5,000,000 for Non-Compete and Non-Disparagement, even though there is no contractual obligation under the Agreement for Promedev to pay for such Work Product.

61.     As a direct and proximate result of MaXXiMedia's material breaches of the Agreement, Plaintiff has suffered general, consequential, and incidental damages in an amount to be proven at trial.

**Count Two**

***Breach of the Implied Covenant of Good Faith and Fair Dealing***

**(Defendants Roby Wilson and MaXXiMedia)**

62.     Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as though fully set forth herein.

63.     Under Washington law, in addition to the duties expressed in the Agreement, MaXXiMedia owed and continues to owe Plaintiff the implied covenant of good faith and fair dealing, which requires that MaXXiMedia do everything that the Agreement presupposes MaXXiMedia will do to accomplish the Agreement's purpose and requires MaXXiMedia to refrain from doing anything that would destroy, injure, or frustrate Plaintiff's rights to receive the benefits of the Agreement.

64.     Plaintiffs have performed all terms, conditions and covenants required on their part to be performed in accordance with the Agreement, except those terms, conditions, and covenants, if any, that MaXXiMedia has waived or that Plaintiff is excused or prevented from performing by virtue of MaXXiMedia's material breaches of the Agreement or other acts and omissions.

COMPLAINT - 22
CASE NO.

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029 | Tel: 206.839.4800

65.    MaXXiMedia has materially breached the covenant of good faith and fair dealing implied in the Agreement in that it, in bad faith and with a motive to intentionally to frustrate Plaintiff's enjoyment of their rights under the Agreement, has committed various acts and omissions. To the extent the breaches alleged above under the breach of contract claim do not constitute breaches of the express terms of the Agreement, they are breaches of the implied covenant of good faith and fair dealing. In addition, MaXXiMedia has breached the implied covenant of good faith and fair dealing by threatening to take actions to harm Promedev's business and reputation.

66.    As a direct and proximate result of MaXXiMedia's multiple breaches of the implied covenant of good faith and fair dealing in the Agreement, Plaintiff has been damaged in an amount to be proven at trial.

## Count Three

### *Breach of Fiduciary Duty*

### (Defendants Roby Wilson and MaXXiMedia)

67.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of the Complaint as though fully set forth herein.

68.    The MaXXiMedia Defendants are in an agency-principal relationship with Promedev whereby the MaXXiMedia Defendants are Promedev's agents. Specifically, in exchange for the compensation set forth at Section 4 of the Agreement, Promedev has placed its trust in MaXXiMedia to take certain actions on its behalf. These actions include, but are not limited to, communicating directly with television networks, negotiating media deals, servicing Promedev's network agreements, facilitating payments to networks for outstanding invoices, and representing Promedev in any other capacity necessary to purchase and place all television media for Promedev. Promedev placed its trust into Mr. Wilson and MaXXiMedia to carry out these responsibilities with Promedev's best interest in mind.

69.     The MaXXiMedia Defendants, as fiduciaries of Promedev, stand in a position of special trust and owe numerous duties to Promedev. These duties are imposed by Washington law and the absence of any clause in the Agreement detailing these fiduciary duties does not relieve the MaXXiMedia Defendants of them. These duties include, but are not limited to: (a) a duty to act loyally for Promedev's benefit in all matters connected with the parties' relationship; (b) a duty to subordinate their self-interest to that of Promedev's; (c) a duty not to deal with Promedev as or on behalf of an adverse party in a transaction connected with the agency relationship; (d) a duty to refrain from competing with Promedev, so long as the agency relationship exists, and from taking action on behalf of or otherwise assisting Promedev's competitors; (e) a duty to Promedev to act with the care, competence, and diligence normally exercised by agents in similar circumstances; (f) a duty, within the scope of the relationship, to act reasonably and to refrain from conduct that is likely to damage Promedev's business and reputation; (g) a duty to use reasonable effort to provide the Promedev with facts that the MaXXiMedia Defendants knew, had reason to know, or should have known when (1) Promedev would wish to have the facts or the facts are material to the MaXXiMedia's duties to Promedev; and (2) the facts could have been provided to Promedev without violating a superior duty owed by the MaXXiMedia to another person.

70.     Based on the allegations set forth in the preceding paragraphs and incorporated by reference herein, MaXXiMedia Defendants are in breach of each of the above listed duties. The breaches include: (a) on information and belief, failing to disclose material information to Promedev about its financial relationship with FNC; (b) making financial demands not provided for in the Agreement; (c) refusing to provide documentation supporting its invoices; (d) threatening Promedev that if it did not immediately pay for Creative Product, Work Product and a Non-Compete and Non-Disparagement agreement that they would take actions to harm Promedev's business, including taking steps to harm Promedev's relationship with FNC and releasing the alleged unauthorized "hot mic" recordings; (e) asserting ownership over and filing

copyright registrations relating to Promedev's commercials; (f) threatening that if Promedev did not immediately pay its financial demands that they would initiate litigation including claims for copyright infringement based on the wrongful copyright registrations, draw governmental scrutiny of Promedev, compete with Promedev, and launch a negative social media campaign against Relief Factor.

71.     Additionally, MaXXiMedia Defendants have breached their fiduciary duties to provide Promedev with necessary information and act with competence and care. MaXXiMedia Defendants failed to maintain accurate financial records and receipts and have failed to tender proper invoices for all amount MaXXiMedia Defendants claim is "owed and due." During the July 14, 2022 recorded call, Mr. Wilson admitted that he has failed to keep any financial records or receipts related to Promedev and was unable to articulate how he calculated the various prices for creative services, work product, or other charges he has applied to Promedev's projects.

72.     With respect to the MaXXiMedia Defendants' demand for $127,027.78 for alleged expenses dating back to 2018, despite numerous requests by Promedev, the MaXXiMedia Defendants refuse to provide any supporting documentation or sufficient explanation of the expenses.

73.     MaXXiMedia Defendants have also breached their duty to act reasonably and to refrain from conduct that is likely to damage Promedev's business and reputation. Specifically, as alleged in all preceding paragraphs above, all of the threats of harm to Promedev's business and reputations, coercive demands for sums of money not provided for under the Agreement in exchange for rights Promedev is already entitled to, and other bad acts are directly damaging to Promedev.

74.     As a direct and proximate result of said breaches of fiduciary duty, Promedev has been damaged in an amount to be proven at trial.

75.     On information and belief, the aforementioned acts were willful, wanton, malicious, oppressive, fraudulent and were undertaken with the intent to frustrate Plaintiff's

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029 | Tel: 206.839.4800

1   rights under the Agreement. Therefore, Plaintiff is entitled to recover exemplary and punitive

2   damages against MaXXiMedia Defendants, inclusive, in addition to actual damages.

3                                          **Count Four**

4                          *Civil Coercion, Extortion, and Blackmail*

5                          **(Defendant Roby Wilson and MaXXiMedia)**

6          76.    Plaintiff re-alleges and incorporate by reference each of the foregoing paragraphs

7   of the Complaint as though fully set forth herein.

8          77.    Since receiving Promedev's notice of termination on July 1, 2022, the

9   MaXXiMedia Defendants, through Wilson and their attorney Coleman, have repeatedly made

10  statements indicating the MaXXiMedia Defendants' intention to do business and reputational

11  harm to Promedev and Promedev's owners if Promedev does not comply with their demands for

12  exorbitant fees that are not provided for under the Agreement.

13         78.    The MaXXiMedia Defendants, through Wilson and their attorney Coleman, have

14  threatened that unless Promedev immediately pays nearly $9,000,000 – including $1,380,000 for

15  Creative Product, $2,000,000 for Work Product, and $5,000,000 for Non-Compete and Non-

16  Disparagement – the MaXXiMedia Defendants would: (a) interfere with Promedev's relationship

17  with FNC and Newsmax; (b) disparage Promedev in the marketplace; (c) cause FNC and

18  Newsmax to pull Promedev's commercials; (d) release alleged "hot mic" unauthorized

19  recordings; (e) draw "scrutiny and unwelcomed attention from various Government agencies";

20  (f) launch a "comparative campaign" for a direct competitor of Promedev's in all media and also

21  launch a negative social media campaign against Promedev.

22         79.    Wilson has communicated these threats both directly and indirectly via written

23  correspondence and orally.

24         80.    Wilson knew at the time these threats were made that they were wrongful.

25         81.    As set forth in the preceding paragraphs, the threats were all made in relation to

26  the MaXXiMedia Defendants' demands for money that are not provided for in the Agreement.

27

28

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029 | Tel: 206.839.4800

82.     These threats from Wilson and Coleman were not only wrongful, but criminal and Promedev reserves the right to refer the matter to the proper authorities.

83.     As a direct and proximate result of MaXXiMedia's coercive threats of extortion and blackmail, Plaintiff has been damaged in an amount to be proven at trial.

**Count Five**

***Declaratory Judgment***

**(Defendants Roby Wilson, MaXXiMedia and Imagipix)**

84.     Plaintiff re-alleges and incorporates every allegation contained in all preceding paragraphs as though fully set forth herein.

85.     An actual, present, and existing dispute exists between Plaintiff Promedev, on the one hand, and Defendants Roby Wilson and MaXXiMedia, on the other.

86.     Under the Washington Uniform Declaratory Judgment Act, RCW 7.24.020 and 7.24.030, Promedev may have the Court determine the question of obligations owed by the parties under the Agreement.

87.     Specifically, Promedev seeks a declaratory judgment determining, but not limited to, the following:

    a.     Promedev has complied with its obligations under, and is not in breach of, the Agreement.

    b.     Promedev's obligations as it relates to commissions after August 31, 2022.

    c.     Promedev's obligations with regard to the Production Expenses not directly related to the production of specific commercials.

    d.     Promedev has no obligation to pay for any Creative Product.

    e.     Promedev is the owner of all of the alleged Creative Product, including all of its commercials and the elements of those commercials, and any copyright registrations filed by the MaXXiMedia Defendants and/or Imagipix are invalid and should be canceled

f.     Promedev has no obligation to pay for any Work Product.

g.     Promedev has no obligation to pay for Non-Compete and/or Non-Disparagement.

88.     Under RCW 7.24.080, Promedev is also entitled to "further relief based on a declaratory judgment or decree" that is "necessary or proper" to enforce the Court's determination of the parties' rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     For declaratory relief pursuant to the Washington Uniform Declaratory Judgment Act, RCW 7.24.020 and 7.24.030, determining the obligations owed by both parties under the Agreement and any further relief based on a declaratory judgment or decree that is necessary or proper to enforce the Court's determination of the parties' rights.

2.     For actual and compensatory damages in an amount to be determined at the trial of this action but no less than the diversity jurisdictional minimum of $75,000;

3.     For the restitution or disgorgement of any and all profits or other consideration obtained, earned, or derived from MaXXiMedia Defendants' acts of self-dealing;

4.     For exemplary and punitive damages;

5.     For costs of suit herein incurred;

6.     For reasonable attorneys' fees;

7.     For interest on any monetary award to Promedev at the maximum legal rate;

8.     For any other orders necessary to accomplish complete justice between the parties; and

9.     For such other and further relief as this Court may deem just and proper.

Dated this 29th day of July, 2022

DLA PIPER LLP (US)

*/s/ Virginia Weeks*
Virginia Weeks, WSBA No. 55007
DLA PIPER LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, Washington 98104-7029
Tel:    (206) 839-4800
Fax:    (206) 839-4801
virginia.weeks@ud.dlapiper.com

**AND**

Michael Garfinkel (CA SBN 156010; *pro hac vice forthcoming*)
Kristina Fernandez Mabrie (CA SBN 31835; *pro hac vice forthcoming*)
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067-4704
Tel:    (310) 595-3000
Fax:    (310) 595-3300
Kristina.fernandezmabrie@dlapiper.com
michael.garfinkel@us.dlapiper.com

*Attorneys for Promedev LLC dba Relief Factor*

# EXHIBIT A

MAXXIMEDIA ADVERTISING CO. AGREEMENT

THIS AGREEMENT made effective as of the 3.1 day of _____ J'.2__ , 'l,d 1O _____ BY AND BETWEEN:

[ADVERTISING AGENCY]

MaXXiMedia Advertising Co.

with an office at 320 Westcott Ste 102 Houston, TX 77007

-and-

[CLIENT]

Promedev LLC dba "Relief Factor"

with an office at 11335 NE 122nd Way, Suite 140 Kirkland, WA 98034

WHEREAS the Client desires to retain the Agency to provide advertising, marketing and related services, as more particularly described below (the "Services"), and the Agency desires to be so retained and to perform the Services for the Client;

NOW THEREFORE the parties agree as follows:

1.      Services. During the term of this Agreement, the Agency shall provide services necessary to purchase and place all media for client, specifically television. The Agency shall be the exclusive provider for television media placement for the client, and the agency agrees to only provide television media placement for the client in the client's category (mutual non-compete.) The Agency shall also provide services necessary to purchase and place outdoor, print, radio, podcasts, digital, digital streaming and other advertisements at the client's discretion. Additional services may include, but are not limited to, research, market planning, public relations, web, digital, design and creative services.

2.      Term. This Agreement shall commence on the date first above written and shall continue for a period of thirty six months, unless sooner terminated in accordance with the terms of this Agreement

(Section 12.) This Agreement shall thereafter be automatically renewed for an additional three year term until terminated by either party as provided herein.

3.     Independent Contractor. It is understood and agreed that the Agency is independent in the performance of this Agreement, that the Agency shall perform the Services under the control of the Client as to the result of such activity only and not as to the means by which such result is accomplished and that the Agency is providing Services on a full time basis. The Agency is not an employee of the Client, and has no authority whatsoever to bind the Client by contract or agreement of any kind other than as expressly provided under the terms of this Agreement. The Client shall not withhold federal income taxes or any other amounts from the Agency's fees payable hereunder. The Client acknowledges and agrees that the Agency shall act on behalf of the Client but will not be liable for payment of media and purchases placed on behalf of Client but for which the Agency has not been paid by Client.

4.     Compensation. Upon execution of this Agreement, the Client agrees to pay the Agency for all media placement/buying an Agency commission or fee of 6% of the gross television media spend on a monthly basis with a hi/lo cap not to exceed $50,000.00 or go below $30,000. Additionally, in the event billing passes specific amounts, the agency will be paid the following in addition to the agreed monthly commission: client exceeds $3,000,000.00 in one month the Agency receives an additional $10,000.00 for that month, client exceeds $5,000,000.00 in one month the Agency receives an additional $20,000.00 for that month. The Client will be charged for additional products and/or services as ordered by the Client which are not part of the Services covered by the terms of this Agreement, at the Agency's current rates for such additional products and/or services. The Client agrees to pay Agency all reasonable out-of-pocket miscellaneous expenses i.e. spot distribution etc. The client will pay delivery charges and expenses when applicable. The client also agrees to pay for the Agency's travel and lodging when traveling for client creative and production. (please note the Agency principal flies business class.)

5.     Payment. The Client is responsible for all billing and purchases the agency makes on the client's behalf. The Agency will invoice the Client at the time of services rendered. Additional products and services, and allowable expenses may also be invoiced at any time. Payments shall be made in a timely fashion.

6.     Unpaid Invoices. All invoices not paid within thirty days or due date are considered overdue. In addition, the Agency at its option may remove commercials from all media outlets, direct or indirect, until payment in full and is collected and cleared from Client.

7.     Confidentiality. The Agency and Client acknowledge that, in the course of providing the Services hereunder, the Agency and Client will have access to confidential information about the Agency's and Client's business. The Agency and client agree to keep all such information strictly confidential and not use it for the Agency's or Client's own benefit nor disclose or divulge such information to any third party. This includes all "work product" in section 8 of this agreement which includes, but is not limited to all rate and billing information. The parties acknowledge that the provisions of this Section shall not apply to any information which: (a) had been rightfully in the possession of the recipient prior to its disclosure to the recipient; (b) had been in the public domain prior to its disclosure to the recipient; (c) has become

part of the public domain by publication or by any other means except an unauthorized act or omission on the part of the recipient; (d) had been supplied to the recipient without restriction by a third party who is under no obligation to maintain such information in confidence; or (e) is required to be disclosed by any federal, state or municipal law, rule or regulation or by any applicable judgment, order or decree or any court or governmental body or agency having jurisdiction in the premises. The provisions of this Section shall survive any termination or expiration of this Agreement.

8.      Ownership of Intellectual Property: Upon payment in full to the Agency, the Client shall have full rights and ownership of any "creative product". Media buying services, work or materials (the "Work Product") created by the Agency except as provided in this Agreement remains the sole property of the Agency. The Client is leasing the use of the "Work Product" provided by the Agency for Client's exclusive use for the duration of the Term, and pursuant to the terms of this Agreement. All "Work Product" and "Creative product" is for the exclusive use of the Client and may not be copied, divulged, disclosed or sold to another party.

9.      Expanded Definition of "Client". Solely for purposes of Sections 7 through 9 inclusive hereof, the term "Client" also shall include any existing or future subsidiaries of the Client that are operating during the time periods described herein and any other entities that directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with the Client during the periods described herein. The provisions of this Section shall survive any termination or expiration of this Agreement.

10.      Remedies. The Agency acknowledges and agrees that the Client's remedy at law for a breach or threatened breach by the Agency of any of the provisions of Sections 7, 8 and 9 would be inadequate and the breach shall be deemed as causing irreparable harm to the Client. In the event of a breach by the Agency of any of the provisions of Sections 7, 8 and 9 of this Agreement, the Agency agrees that, in addition to any remedy at law available to the Client, the Client shall be entitled to obtain injunctive relief, or any other appropriate equitable remedy, without having to post a bond or other security. It is expressly understood and agreed by the Agency that although the parties consider the provisions in this Agreement to be reasonable, if any provision herein is determined by a court of competent jurisdiction to be indefinite, invalid, illegal or otherwise unenforceable, in whole or in part, for any reason, the remainder of this Agreement shall continue in full force and effect and shall be construed as if such indefinite, invalid, illegal or unenforceable provision had not been contained herein.

11.      Indemnification. The Client shall indemnify, defend and hold harmless the Agency, its subsidiaries, affiliates and their directors, officers, employees, agents, successors and assigns from and against any and all claims relating to this Agreement arising out of acts or omissions of the Client, including, but not limited to, any financial obligations incurred by the Agency on behalf of the Client and attorneys' fees required to defend the Agency. The Client is responsible for reviewing all creative materials and advertisements to ensure compliance with all federal, state/provincial and local laws and regulations.

12.     Client Indemnification. The Agency shall indemnify, defend and hold harmless the Client, its subsidiaries, affiliates and their directors, officers, employees, agents, successors and assigns from and against any and all claims relating to this Agreement arising out of acts or omissions by the Agency. This includes attorneys' fees required to defend the Client.

13.     Termination. This Agreement may be terminated by either party on sixty (60) days written notice to the other party. In the event of such termination, the Client shall promptly pay all sums owed to the Agency to and including the effective date of termination, including any future non-cancelable commitments after the termination date.

14.     Attorneys' Fees. In the event that the services of an attorney are required or legal action is taken to enforce the terms of this Agreement by either party, or to protect those rights provided by this contract or by law, the prevailing party shall be entitled to an award of actual attorney's fees, costs, and expenses reasonably expended.

15.     Counterpart and Facsimile Signatures. This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one and the same instrument. A facsimile signature shall be considered the same as an original.

16.     Entire Agreement. This Agreement and any schedules attached hereto constitute the entire agreement between the parties to this Agreement pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties and there are no warranties, representations or other agreements between the parties in connection with the subject matter of this Agreement except as specifically set forth herein. No alteration, amendment, addition or modification of or to this Agreement shall be binding unless the same is in writing executed by each of the parties.

17.     Assignability. This Agreement is not assignable by either party without the prior written consent of the other party hereto.

IN WITNESS WHEREOF the parties hereto have executed this Agreement on the date first above written.

[ADVERTISING AGENCY]                              [CLIENT]

By:                                               By:

Roby M. Wilson, Owner                             Seth Talbott, CEO

*Roby Max Wilson*

# EXHIBIT B

**VIA ELECTRONIC MAIL**

July 1st, 2022

MaXXiMedia Advertising Co.
320 Westcott, Ste. 102
Houston, TX 77007
Attn: Roby Wilson
Email: roby@maxximedia.com

Re:     Notice of Termination of MaXXiMedia Advertising Co. Agreement

Dear Roby:

Reference is hereby made to that certain MaXXiMedia Advertising Co. Agreement ("Agreement") by and between your company, MaXXiMedia Advertising Co. ("Agency") and our company, Promedev LLC doing business as Relief Factor ("Client"), dated as of July 31, 2020, in connection with Agency's furnishing of advertising, marketing and related services to Client.

Pursuant to our phone call earlier today, this notice of termination letter ("Letter") is to confirm our election to terminate the Agreement on August 31, 2022 pursuant to Section 13 of the Agreement.

Pursuant to Sections 8 and 13 of the Agreement, we have prepared a termination agreement, enclosed herein, to confirm, among other things: (i) Client's rights and ownership of any "creative product" created by Agency or its designees during the term of the Agreement, and (ii) Client's remaining payment obligations to Agency under the Agreement. Please confirm that Agency irrevocably consents, acknowledges and agrees to such termination, without any reservation of its rights thereunder and that you, Roby Wilson, have the authority to irrevocably consent, acknowledge and agree to such termination on behalf of Agency, by returning a partially executed version of the enclosed termination agreement to our attention (electronic mail is sufficient) at your earliest convenience.

Please do not hesitate to contact us if you have any questions.

Sincerely,

Authorized Signatory of
Promedev LLC dba Relief Factor

Encl. Termination Agreement

# EXHIBIT C

Invoice



**MAXXIMEDIA ADVERTISING COMPANY**

Mailing address: 9 N. MeadowmistCir.
The Woodlands, TX 77381
Physical address 320 Westcott Suite 102
Houston. TX 77007

| Date | Invoice # |
| --- | --- |
| 7/15/2022 | 650 |

| Bill To |
| --- |
| Promedev LLC<br>Robert Wagner<br>11335 NE 122nd Way<br>Kirkland, WA 98034 |

| Ship To |
| --- |
| |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
| --- | --- | --- | --- | --- | --- | --- |
| | due 07/18/2022 | | 7/15/2022 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
| --- | --- | --- | --- | --- |
| | ID Invoice | Sums (commissions) owed to the Agency to and including the effective date of termination, including any future non-cancelable commitments after the termination date MAY 22 - DEC 22 8 months @ $50,000.00 per month | 400,000.00 | 400,000.00 |
| | ID Invoice | Client exceeds $3,000,000.00 in one month the Agency receives an additional $10,000.00 for that month. 10/21,5/21,1/22,5/22,6/22 and 10/22 6 months @ $10,000.00 | 60,000.00 | 60,000.00 |
| | ID Invoice | Miscellaneous, spot distribution, delivery charges, loading and travel for production that may be invoiced at any time. see details attached | 127,087.78 | 127,087.78 |

| We appreciate your prompt payment. | **Total** | $587,087.78 |
| --- | --- | --- |

Invoice



**MAXXIMEDIA ADVERTISING COMPANY**

Mailing address: 9 N. MeadowmistCir.
The Woodlands, TX 77381
Physical address 320 Westcott Suite 102
Houston. TX 77007

| Date | Invoice # |
|------|-----------|
| 7/15/2022 | 651 |

| Bill To | Ship To |
|---------|---------|
| Promedev LLC<br>Robert Wagner<br>11335 NE 122nd Way<br>Kirkland, WA 98034 | |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | due 07/18/2022 | | 7/15/2022 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| | ID Invoice | Payment for copyrighted "Creative Product" pursuant to Paragraph 8 of Agreement 178 spots plus all creative projects and content | 1,380,000.00 | 1,380,000.00 |

We appreciate your prompt payment.

| | Total | $1,380,000.00 |
|---|-------|---------------|

Invoice



**MAXXIMEDIA ADVERTISING COMPANY**

Mailing address: 9 N. MeadowmistCir.
The Woodlands, TX 77381
Physical address 320 Westcott Suite 102
Houston. TX 77007

| Date | Invoice # |
|------|-----------|
| 7/15/2022 | 652 |

| Bill To |
|---------|
| Promedev LLC |
| Robert Wagner |
| 11335 NE 122nd Way |
| Kirkland, WA 98034 |

| Ship To |
|---------|
| |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | due 07/18/2022 | | 7/15/2022 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| | ID Invoice | "Work Product" pursuant to paragraph 8 of agreement includes use of Maxximedia's rates for the duration of the 2022 agreement term. Cannot be referred to beyond use of the term...solely for 2022. | 2,000,000.00 | 2,000,000.00 |

We appreciate your prompt payment.

| | Total | $2,000,000.00 |
|-|-------|---------------|

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on July 29, 2022, I electronically filed the foregoing with the Clerk

3   of the Court using the CM/ECF system which will send notification of such filing to all parties

4   or their counsel of record.

5          Dated this 29th day of July, 2022.

6                                              *s/ Virginia Weeks*
                                               _____
7                                              Virginia Weeks

8

9   WEST\299361438.13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28